UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RACHEL ELLEN HAMILTON,

               Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.

No. 10-10605
District Judge Sean F. Cox
Magistrate Judge R. Steven Whalen

_____ /

## REPORT AND RECOMMENDATION

Plaintiff Rachel Ellen Hamilton brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits under the Social Security Act. Parties have filed cross motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment DENIED.

## PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits ("DIB") on March 8, 2007, alleging a disability onset date of June 26, 2006 (Tr. 93). Upon denial of her claim, Plaintiff requested an administrative hearing, held on June 16, 2009 in Lansing, Michigan (Tr. 21). Administrative Law Judge ("ALJ") B. Lloyd Blair presided (Tr. 21). Plaintiff, represented by attorney Charles Robison, testified, as did Plaintiff's mother-in-law Gladys Hubbell and Vocational Expert ("VE") Heather Benton (Tr. 26-42, 43-47, 48-54). On July 27, 2009, ALJ Blair found that although Plaintiff was unable to return to her past relevant work, she could perform a significant range of unskilled, exertionally medium jobs[1] (Tr. 19-20). On December 17, 2009, the Appeals Council denied review

_____

[1]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

(Tr. 1-3). Plaintiff filed suit in this Court on February 11, 2010.

## BACKGROUND FACTS

Plaintiff, 27 at the time of the administrative decision, completed two years of college and worked previously as a laboratory technician, phone representative, nursing assistant, and salesperson (Tr. 108, 113). She alleges disability as a result of depression, post traumatic stress disorder ("PTSD"), and postpartum depression (Tr. 107).

### A. Plaintiff's Testimony

Plaintiff, 5'4" and 235 pounds, testified that she drove on a regular basis (Tr. 27). She reported that she was currently working toward a Bachelor's degree, but had already obtained an Associate's degree and a phlebotomy certificate[2] (Tr. 27). Plaintiff reported that she had taken 12 credit hours in the previous semester (Tr. 28).

Plaintiff testified that she last worked in a hospital lab 32 hours each week until getting "cut back to 20 hours a week" by her obstetrician (Tr. 28). She reported that in the last 15 years, she had also worked in retail sales and at a retirement home, adding that she quit work entirely in May 2, 2006 per her obstetrician's advice (Tr. 32). She added that since the June 26, 2006 alleged onset of disability, she had performed volunteer work at an overnight camp for mentally disabled adults (Tr. 32).

Plaintiff opined that borderline personality disorder, severe depression, bipolar disease, and migraine headaches precluded all gainful employment (Tr. 33). Plaintiff reported that she took Tramadol for headache pain and Toradol for particularly severe headaches (Tr. 34). Plaintiff testified that her migraines were often characterized by vomiting and the need to sleep for several hours (Tr. 39). She stated that migraines, occurring twice a week, did not prevent her from attending college classes (Tr. 40). She indicated that she currently saw both a psychiatrist and therapist, noting

---

[2]"Phlebotomy technicians work with other professionals in the hospital and outpatient environments to collect and prepare blood samples for laboratory testing." http://www.mayo.edu/mshs/phlebotomy-rch.html.

that she took Seroquel, Wellbutrin, Lithium, Lexapro and Klonopin (Tr. 34-35).  She reported that she had received inpatient mental health treatment in the past year (Tr. 35).  She admitted to being a "pack a day" smoker and to prior illicit drug use (Tr. 35).

Plaintiff reported that she read as a hobby and regularly performed household chores (Tr. 36).  She acknowledged that she could climb stairs, but experienced shortness of breath, back pain, and leg cramps (Tr. 37).  She denied problems bending or squatting (Tr. 37).  She reported that she regularly went to bed at 6:00 or 7:00 a.m. and arose at 1:00 or 2:00 p.m. (Tr. 37).  Plaintiff testified that she spent her waking hours preparing homework assignments, reading, watching television and "interacting" with her husband and son (Tr. 37).  She noted that she limited her social contacts to small groups of relatives (Tr. 37).

Plaintiff estimated that she could lift up to 30 pounds, stand for up to 15 minutes,  walk for a maximum of a block and a half , and sit for unlimited periods (Tr. 38).  She attributed her frequent job changes to her difficulty "interacting with coworkers and . . . supervisors" (Tr. 39).  She reported that obesity made her self conscious and fatigued (Tr. 39).  She also reported sleep difficulties (Tr. 41).  Alleging that she needed to spend significant portions of each day alone, Plaintiff reiterated that she was unable to work full time (Tr. 42).  She acknowledged that her physician had advised her to lose weight and quit smoking (Tr. 42).

### B.  Testimony of Plaintiff's Mother-in-law

Plaintiff's mother-in-law, Gladys Hubbell, testified that she had known Plaintiff for approximately 10 years (Tr. 43).  Hubbell, a registered nurse, reported that Plaintiff stayed at home most of the time and did not have many friends (Tr. 44).  She estimated that Plaintiff experienced migraines once a week, incapacitating her for between "hours" up to an entire day (Tr. 44).  Hubbell noted that Plaintiff had been hospitalized for mental instability on more than one occasion, adding that her daughter-in-law had cut herself  (Tr. 44).  She also noted that Plaintiff had been "suicidal" approximately three times a year, at which time she was taken for emergency treatment (Tr. 45-46).  She characterized Plaintiff as manipulative (Tr. 46).  Hubbell stated that during the time her son and

Plaintiff were living with her, Plaintiff had emotional outbursts approximately once every two weeks (Tr. 46). Hubbell opined that Plaintiff's psychological condition precluded all gainful employment (Tr. 47).

### C. Medical Records

### 1. Treating Sources

Emergency room discharge notes from February, 2005 indicate that Plaintiff experienced ongoing headaches (Tr. 177-178). A physical exam was unremarkable (Tr. 174). Plaintiff was discharged in stable condition after receiving Vicodin (Tr. 178). Treating notes from the following month show that Plaintiff received Compazine for migraine headaches (Tr. 171). Plaintiff again sought treatment for migraines in April, 2005 and was given Midrin before her release (Tr. 168). In July, 2005, Robert Roberson, D.O. noted that Plaintiff experienced migraines and panic attacks (Tr. 183). Plaintiff requested a prescription for Xanax in October, 2005 (Tr. 182).

In June, 2006, Plaintiff gave birth by cesarian section without complications (Tr. 151-152, 163). Discharge notes indicate that she was taking Vicodin, prenatal vitamins, Motrin, and Prozac (Tr. 163). In August, 2006, Plaintiff, reportedly depressed since the birth of her son, told Tracy M. Anderson M.S. C.N.M. that she had made plans to stay at home with her son for the next year (Tr. 384). In September, 2006, Plaintiff told Dr. Robertson that she had recently fought with her husband and mother-in-law (Tr. 181). Dr. Anderson M.S. C.N.M. advised that due to postpartum depression, Plaintiff should "not be left alone" (Tr. 380). Psychiatric intake notes from the following month indicate that Plaintiff had been depressed and anxious since the birth of her son (Tr. 291, 298). She was assigned a GAF of 55[3] (Tr. 296).

Treating notes from the following month indicate that Plaintiff's affect was appropriate (Tr. 288). Dian Breining, L.P.C gave Plaintiff a "good" prognosis, directing her to "practice coping

---

[3]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ) (4th ed.2000).

skills" (Tr. 288). Breining's December, 2006 treating notes indicate that Plaintiff was cutting herself, but did not have suicidal ideation (Tr. 284). Breining gave her a "poor" diagnosis at that time (Tr. 284). Treating notes from later the same month indicate that Plaintiff made a suicide gesture after arguing with her brother-in-law (Tr. 283). She was assigned a "fair" prognosis (Tr. 283). In January, 2007, Plaintiff, no longer cutting herself, admitted that she had previously cut herself when she was "not getting enough attention" (Tr. 282). She was assigned a "good" prognosis (Tr. 282). Notes from later the same month indicate that Plaintiff was cutting herself on a regular basis but one week later received a "good" prognosis (Tr. 279-280).

Dr. Robertson's February, 2007 notes indicate that Plaintiff was checking into an inpatient facility for anxiety and depression (Tr. 180). Inpatient psychiatric notes dated February 16-20, 2007 indicate that Plaintiff reported "suicidal thoughts" and considered cutting herself (Tr. 186). Plaintiff reported that she had been depressed since her teens (Tr. 186). Other treating notes state that Plaintiff experienced the onset of depression after the birth of her son (Tr. 193). Plaintiff admitted to occasional marijuana use (Tr. 195). She reported that she was capable of self care activities and denied hallucinations (Tr. 197). She was prescribed Seroquel, Xanax, and Prozac (Tr. 186). At the time of her discharge on February 20, Plaintiff denied depression or suicidal thoughts (Tr. 187). She was assigned a GAF of 28 on admission and 40 upon discharge[4] (Tr. 187). She was diagnosed with postpartum depression (Tr. 189).

In March, 2007, Dr. Breining stated that Plaintiff was making "good" progress (Tr. 263). In April, 2007, Breining's treating notes state that Plaintiff was nervous but had a "good" prognosis

---

[4]A Global Assessment of Functioning ("GAF") score of 21-30 indicates that "behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas. American Psychiatric Association." *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR*)(4th ed. 2000). A GAF score of 31-40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *Id.* Additional documentation states that Plaintiff had a GAF of 40 upon *admission* and a 28 at the time of discharge (Tr. 192). However, this contradicts treating notes which state that Plaintiff's condition had stabilized over the course of the four day inpatient stay (Tr. 187).

(Tr. 275).   In April, 2007,  Plaintiff's mother-in-law attended a counseling session, reporting that Plaintiff was manipulative and left household chores and the care of her infant son to others while she left the house/drank at night (Tr. 257).   At the end of month,  Breining noted that Plaintiff, reporting that she still received strong support from her husband and family, admitted to drinking heavily and engaging in sexual activity with both her friend and the friend's husband (Tr. 254). Breining recommended detox treatment (Tr. 250).  In June, 2007,  Breining composed a letter on behalf of Plaintiff's quest for disability benefits, opining that her prognosis was "fair-poor" (Tr. 238).  She stated that Plaintiff's emotional instability rendered her disabled (Tr. 238).

February, 2008 intake notes state that Plaintiff indicated that conflicts with her mother-in-law had precipitated a recent bout of depression (Tr. 424-425).  She displayed a depressed mood, but no "suicidal, homicidal, or delusional ideation" (Tr. 426).   Plaintiff displayed "fair" judgment but "poor" impulse control (Tr. 426).  She was assigned a GAF of 35 (Tr. 427).  In March, 2008, Breining, noting Plaintiff's ongoing conflicts with her in-laws and her cessation of the treating relationship, opined that Plaintiff should be evaluated for mental illness (Tr. 452).

Intake notes from April, 2008 state that Plaintiff exhibited a "sad affect" (Tr. 346).  Notes from later the same month show that Plaintiff appeared less fatigued and agitated and reported better sleep (Tr. 341).  In May, 2008, Plaintiff's therapist, noting that she had cut herself superficially twice in the past three days, advised her to enter Dialectical Behavior Therapy ("DBT")(Tr. 338). Plaintiff refused, stating that she neither needed nor wanted therapy (Tr. 338).  In June, 2008, Plaintiff sought emergency treatment after becoming physically aggressive with husband and then cutting her stomach and arm (Tr. 418).  Plaintiff was advised by her therapist to "reign in drama" (Tr. 331).   The next month, Plaintiff reported that she had "kept her cool" during potentially stressful family interaction (Tr. 330).  A July, 2008 CT of the head was unremarkable (Tr. 415, 478). Emergency room notes from the next month state that Plaintiff's headache was caused by "muscle tension, fatigue, and/or emotional upset" (Tr. 412).  Plaintiff reported continued headaches in December, 2008 (Tr. 260).

A March, 2009 psychological intake assessment by Adrienne Rowland, L.M.S.W., noting that Plaintiff reported low energy, sleep problems, and low libido, found a GAF of 45 (Tr. 505-507). Treating notes state that Plaintiff told her husband that if he left her, she would commit suicide (Tr. 503). Later, the same month, Plaintiff reported that her relationship with her husband had improved (Tr. 502). The following month, Plaintiff denied that she had experienced symptoms of hypomania associated with bi-polar disease, noting that she was attending school full time and felt "normal" (Tr. 499). In May, 2009, Dana DeWitt, D.O., stating that Plaintiff experienced daily headaches and a borderline personality disorder, opined that the conditions would prevent her for attending work more than three days each month (Tr. 347-350). Therapy notes from the same month state that Plaintiff was sleeping better and had not been taking psychotropic medication or cutting herself "for quite some time" (Tr. 495). She stated repeatedly that cutting was not a suicide gesture, but a means of coping (Tr. 493).

On June 5, 2009, Plaintiff announced that she was discontinuing counseling (Tr. 491). On June 11, 2009, Ahmad Zubairi, M.D. gave Plaintiff a "guarded" prognosis, assigning her a GAF of 45[5] (Tr. 431). He found, among other things, that Plaintiff experienced thoughts of suicide, psychomotor agitation or retardation, mood disturbances, paranoia, and unstable personal relationships (Tr. 432). Declining to assess Plaintiff's work-related limitations, he opined that her condition could "be expected to last a least twelve months" (Tr. 435). He found the presence of affective, psychotic, personality, and anxiety disorders (Tr. 438-440, 442, 444). Under the "'B' Criteria, he found that Plaintiff experienced moderate restrictions in daily living, and marked social and concentrational limitations with three episodes of decompensation of extended duration (Tr. 447).

---

[5]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* )(4th ed.2000)

On June 14, 2009 (two days prior to the administrative hearing), Ms. Rowland, assigning Plaintiff a GAF of 40, noted "loss of interest in almost all activities," thoughts of suicide, concentrational problems, mood disturbances, and sleep disturbances, among other symptoms of mental health disease (Tr. 509). Rowland found the that Plaintiff experienced moderate concentrational and time management impairments, and marked limitations in the ability to accept criticism and work with others (Tr. 511).

## 2. Consultive and Non-Examining Sources

In May, 2007, John D. Jeter, M.A., L.L.P. performed a consultive psychological examination of Plaintiff on behalf of the SSA (Tr. 210). Plaintiff reported good results from a combination of Seroquel, Effexor, and Xanax (Tr. 210). She reported that she arose at seven a.m. and retired at midnight (Tr. 210). Plaintiff admitted that she regularly engaged in housekeeping, church activities, driving, shopping, childcare activities and cooking simple meals (Tr. 210). She indicated that her leisure activities consisted of walking, watching movies/television, socializing with friends, and dining out (Tr. 210). She reported good relationships with her former coworkers, noting that she stopped working as a phlebotomist when she became pregnant (Tr. 210). She stated that she was not working presently because she was "too emotional and . . . not motivated to find work" (Tr. 210).

Plaintiff was deemed moderately obese with no physical limitations (Tr. 211). She presented as mildly depressed with low self esteem but exhibited good eye contact with a "logical, organized, and goal directed" thought process (Tr. 211). Dr. Jeter observed that Plaintiff "has a good confidence level in her own abilities and uses problem solving strategies for task completion" (Tr. 211). Noting that she had first experienced depression at the age of 20, Plaintiff reported "mild" symptoms (Tr. 212). She was assigned a GAF of 62[6] (Tr. 212).

---

[6]GAF scores in the range of 61-70 indicate "some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 32 (*DSM-IV-TR* ), 30 (4th ed.2000).

The following month, a Psychiatric Review Technique, noting a diagnosis of depression and substance abuse disorders (217, 220,225), found "mild" restrictions in daily living and social functioning and "moderate" deficiencies in "concentration, persistence, or pace" (Tr. 227). A Mental Residual Functional Capacity Assessment performed the same month found *moderate* limitations in the ability to understand and remember detailed instructions, maintain regular attendance, work in coordination with others, sustain concentration for normal work periods, maintain socially appropriate behavior, and set realistic goals (Tr. 214). Plaintiff's work abilities were deemed otherwise unimpaired (Tr. 213-214).

### D. VE Testimony

VE Heather Benton, stating that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("DOT"), classified Plaintiff's past work as a phlebotomist as semiskilled at the light level of exertion; cashier, unskilled/light; telephone representative, semiskilled/sedentary; home attendant, semiskilled/medium, and nurse assistant, semiskilled/medium (Tr. 49-50). The ALJ then posed the following hypothetical question:

> "[A]ssume a hypothetical individual who could meet the demands of light work who should only occasionally use ramps, stairs, stoop, kneel, crouch and crawl. She'd have the same . . . skill work with an SVP of one or two. She'd have work providing for one absence, tardy or leaving work early once per month; work that has minimal interpersonal contact or discussions with coworkers and supervisors; work with brief and superficial contact with the general public; work that does not require the individual to take initiative or make job decisions; work without production quotas, mandating a specific number of pieces per hour or having a down-line or up-line dependent coworker. In your opinion would such . . . an individual do Claimant's past relevant work?"

(Tr. 50). The VE found that based on the hypothetical limitations, Plaintiff was unable to return to any of her past relevant work but could perform the unskilled, light work of a hand packager (7,000 jobs in the regional economy), material mover (700), and equipment cleaner (1,200) (Tr. 51).

The VE stated that in addition to the DOT, she had drawn her job numbers from *Occupational and Employment Quarterly* and her own education and professional experience (Tr. 51). The VE concluded her testimony by stating that if Plaintiff's testimony were fully credited, she would be unable to perform any job (Tr. 51).

### E.  The ALJ's Decision

Citing Plaintiff's medical records, ALJ Blair found that although Plaintiff experienced the severe impairments of obesity, migraine headaches, and an affective disorder, none of the conditions met or equaled any impairment listed in Appendix 1, Subpart P, Regulations No.4 (Tr. 12-13).  The ALJ found that Plaintiff retained the  Residual Functional Capacity ("RFC"):

> "[M]edium work . . . except she can lift up to 30 pounds maximum and occasionally and up to 10 pounds frequently, while sitting, standing, and/or walking up to 6 hours during an 8_hour work shift.  She should never use ladders, scaffolds, and ropes; and only occasionally use ramps, stairs, stoop, crouch, kneel, or crawl.  Work must be simple and unskilled with an SVP of only 1 or 2; must allow absences, tardiness, or early departure once a month; minimal interaction/contact/discussion with co-workers or directions from a supervisor; brief and superficial contact with the general public; no requirement to take initiative or make independent decisions; and no production quotas mandating a specific number of pieces per hour or with a down line co-worker depending on claimant productivity"

(Tr. 14).  Adopting the VE's numbers, the ALJ found that although Plaintiff could not perform any of her former jobs, she could as a hand packer, material mover, and equipment cleaner (Tr. 20).

The ALJ supported his determination by noting that Plaintiff's claims of disability were "not credible to the extent they [were] inconsistent with the [RFC]" (Tr. 15).  He noted that allegations of disability level migraines stood at odds with  Plaintiff's regular college class attendance (Tr. 18).  He also noted that Plaintiff reported good results from anti-depressant and anti-anxiety medications (Tr. 18). The ALJ stated that Plaintiff's alleged obesity related limitations had been factored into the RFC (Tr. 17).

### STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir.  1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126

(1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes four arguments in favor of remand for either an award of benefits or further fact-finding. First, she contends that the ALJ failed to apply SSR 02-01p "in evaluating the severity of [her] extreme obesity." *Plaintiff's Brief* at 10-12, *Docket #12.* Second, she submits that the ALJ erred in finding that her psychological conditions did not meet or equal a listing at Step Three of the

administrative sequence. *Id.* at 12-14. Third, she faults the ALJ for discounting the opinions of Drs. Dana DeWitt, Ahmed Zubairi, and therapist Adrienne Rowland. *Id.* at 15-16. Finally, she argues that the ALJ erred in discounting the credibility of her testimony, contending that administrative analysis did not conform with the requirements of SSR 96-7p. *Id.* at 17-18.

The ALJ's finding that Plaintiff was not disabled at Step Three hinges on the strength of the "treating physician" and credibility analyses. Therefore, the Court will address her arguments in the following order: "Obesity," "Treating physicians," Credibility, and "Step Three Findings."

### A. Obesity

Plaintiff argues that the ALJ failed to comport with the requirements of SSR 02-01p in evaluating the impact of obesity on her vocational abilities. *Plaintiff's Brief* at 10-12. Citing *Oliver v. Commissioner of Social Sec.,* 2010 WL 1002618 (E.D.Mich. 2010) (Hluchaniuk, M.J.), she contends that the ALJ's deficient analysis mandates a remand for further factfinding. *Id.* at 12.

Obesity, by itself, does not constitute a disability. *Social Security Ruling* (SSR) 02-1p. Nonetheless, the condition must be considered in combination with other impairments in determining whether the claimant is disabled. *Id.* The administrative findings need not contain an explicit reference to the claimant's obesity if the decision as a whole appears to have adopted limitations resulting from the condition. *Coldiron v. Commissioner Of Social Security,* 2010 WL 3199693, *7 (6th Cir. 2010)(*citing Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir.2004)).

*Oliver, supra,* cited by Plaintiff for the proposition that her obesity requires a remand for more careful analysis, is inapplicable to the present facts. The record states that Oliver, 6' 2" and 630 pounds, had a body mass index ("BMI") of 80.9, and experienced the obesity related impairments asthma, high blood pressure, and sleep apnea. *Id.,* 2010 WL 1002618, *2. In contrast here, Plaintiff, 5' 4" and 244 pounds at her heaviest, had a BMI of 41.9 (Tr. 17). Unlike Oliver, she does not claim to experience obesity related disorders, and reported to at least one medical source that her weight did create *any* functional limitations (Tr. 211).

The ALJ's obesity analysis does not otherwise present grounds for remand. He properly acknowledged that the condition created work related limitations by including it among Plaintiff's "severe" impairments at Step Two (Tr. 12). The ALJ also cited medical records alluding to Plaintiff's obesity noting, "slow but steady weight gains" between September, 2006 (219 pounds) and February, 2007 (244) (Tr. 17). However, he observed that the RFC, restricted to medium work with significant postural restrictions, reflected limitations caused by obesity (Tr. 14, 17). Giving only partial weight to Plaintiff's claims of obesity related impairments, the ALJ cited Plaintiff's statement that obesity did not create secondary problems (Tr. 17, 211).

The obesity analysis, absent either procedural or substantive error, should be upheld.

**B. The Treating Physician Analysis**

Plaintiff argues next that the ALJ erred in discounting the opinions of Drs. Dana DeWitt, Ahmed Zubairi, and therapist Adrienne Rowland. *Id.* at 15-16. Citing Dr. Zubairi's finding that she experienced disability level psychological impairments, she argues that instead of adopting the treating psychiatrist's opinion, the ALJ improperly "cherry picked . . . nonrepresentative events" from the record to support his conclusion that Plaintiff was not disabled. *Id.* at 16.

Plaintiff's argument that the ALJ "cherry picked" the record is based on the premise that a non-disability finding "cannot be based on fragments of the record." *Laskowski v. Apfel,* 100 F.Supp.2d 474, 482 (E.D.Mich.2000)(Lawson, J.). Specifically, Plaintiff takes issue with the ALJ's rejection of Dr. Zubairi's, June 11, 2009 finding that she experienced marked social and concentrational problems (Tr. 447).

Consistent with the requirements of a "treating physician" analysis as stated in 20 C.F.R. § 404.1527(d)(2)), the ALJ discussed the length and nature of Plaintiff's treating relationship with Dr. Zubairi, noting that relationship did not begin until two years after the alleged onset of disability (Tr. 18). The ALJ found that the psychiatrist's finding of "marked" psychological impairments was undermined by treating notes showing that Plaintiff did not experience such limitations "for more than a few days at a time a couple of times a year since the alleged onset date" (Tr. 18).

-13-

Substantial evidence, cited elsewhere by the ALJ, amply supports his rejection of Dr. Zubairi's findings. The ALJ noted that although Plaintiff reported to multiple treating sources that her depression began in her teens, she was able to work up until the age of 24 when her son was born (Tr. 17). Despite Dr. Zubairi's opinion that Plaintiff experienced practically institutional level psychological impairment, she was able to care for herself, attend class, and perform household chores (Tr. 17). As discussed further below, Plaintiff's summation of her condition, found in both treating and consultive examination notes, undermines Dr. Zubairi's findings (Tr. 211).

Because the ALJ's rejection of Dr. Zubairi's findings is well-explained and well-supported, remand on this basis is not warranted. *See Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391 -392 (6th Cir. 2004)(In the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings).[7]

## C. Credibility

Plaintiff also argues that contrary to the requirements of SSR 96-7p, the ALJ failed to give "specific reasons" for rejecting her allegations of disability. *Plaintiff's Brief* at 17-18. She also faults the ALJ for making only "fleeting" mention of her mother-in-law's testimony. *Id.* at 17.

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms. *See Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 853 (6th Cir. 1986); SSR 96-7p. "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable

---

[7]Plaintiff's issue statement regarding treating sources also asserts that Dr. DeWitt and Adrienne Rowland's opinions were improperly discounted. *Plaintiff's Brief* at 15. However, the text of the argument is absent any reference to Rowland and mentions Dr. DeWitt only once without explaining how the ALJ erred. Any issue not raised directly by Plaintiff is deemed waived. *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002). As to Dr. DeWitt's opinion, the ALJ found that Plaintiff's claim of debilitating headaches was contradicted by her testimony that she was able to attend class faithfully despite the condition (Tr. 18 *citing* 40). Likewise, he noted that Rowland's June, 2009 "disability opinion" stood at odds with the therapist's own treating records stating that Plaintiff was attending college classes and her condition was improving (Tr. 17 *citing* 499).

clinical and laboratory diagnostic techniques." *Id.* Second, SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must analyze his testimony "based on a consideration of the entire case record."

Plaintiff's credibility argument is without merit. She asserts that the ALJ failed to provide "specific reasons" for discounting her testimony. In making this argument, she lifts a block quote from the administrative opinion, which in fact includes multiple "specific reasons" for rejecting her claims. *Plaintiff's Brief* at 17 (*citing* Tr. 18). The ALJ noted that Plaintiff's testimony that headaches did not prevent her from attending college full time contradicted her claim that the same condition precluded all gainful employment (Tr. 18).

Likewise, the ALJ rejected Plaintiff's claim that she was unable to function around coworkers or supervisors on even a superficial level, pointing out that her social limitations did "not appear to be functionally limiting on a college campus where [she] must interact and/or be in a room with a lot of other people and where she is expected to adhere to schedules, take tests, and follow directions without argument" (Tr. 18). While Plaintiff faults the ALJ for making only one reference to Gladys Hubbell's testimony (Tr. 15), in fact, portions of the mother-in-law's testimony are consistent with the non-disability conclusion. Hubbell characterized Plaintiff's headaches as occurring "weekly," stating that the condition "debilitate[d] her *to a certain degree*" (emphasis added)(Tr. 44). Hubbell's statement that Plaintiff had undergone inpatient briefly in February, 2007, following a post-partum depression diagnosis and sought emergency or outpatient psychological treatment on a limited and sporadic basis thereafter (Tr. 44-45) is consistent with the conclusion that Plaintiff's limitations, while severe, were not disabling.

Plaintiff's May, 2007 statements to a consultive examiner also support the ALJ's credibility determination. She acknowledged that she did house work and meal preparation, took walks, socialized, ate out, and watched movies (Tr. 210). Her admission that she enjoyed good working relationships with former co-workers stands in direct contradiction to her testimony that had

experienced problems "interacting with coworkers and . . . supervisors" (Tr. 39, 210). While she opined that she was "too emotional" to work, Plaintiff, then the mother of an 11-month-old son, also admitted that she was presently "not motivated to find work" (Tr. 210).

While the consultive examination admissions are particularly supportive of the ALJ's finding, evidence found elsewhere in the record further supports the ALJ's conclusions. For example, although Plaintiff testified on June 16, 2009 that she was currently taking Seroquel, Wellbutrin, Lithium, Lexapro and Klonopin (Tr. 34-35), she told Rowland (shortly before terminating treatment on June 5, 2009) that she had not taken psychotropic medication or cut herself "for quite some time" (Tr. 495).

For these reasons, the deference generally accorded an ALJ's credibility determination is appropriate here. *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993).

### D.  Step Three Findings

Finally, Plaintiff argues that the ALJ erred by not finding her disabled at Step Three of the administrative sequence. *Plaintiff's Brief* at 12-14. She argues, in effect, that Dr. Zubairi's finding that she experienced "marked" social and concentrational limitations mandates a disability finding under Listing 12.04 (Affective Disorders) or 12.08 (Personality Disorders).[8] *Id.*

Listing 20 C.F.R. part 404, Subpart P, Appendix 1, 12.04 states in pertinent part ("'A' Criteria"):

> *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>  A. Medically documented persistence, either continuous or intermittent, of one of

---

[8]Plaintiff's *Reply,* expanding on her original argument, also asserts that Dana Breining's findings support disability under the listings. *Reply, Docket #15* at 2. However, the ALJ provided his rationale for rejecting the therapist's opinion, correctly noting that Breining's treatment notes (often showing a "good" prognosis) did not support the disability conclusion (Tr. 15).

the following:
1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions or paranoid thinking;

"Personality Disorders" as stated in Listing 12.08 ("'A' Criteria") are characterized as follows:

inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress, evidenced by at least one of the following:

1. Seclusiveness or autistic thinking

2. Pathologically inappropriate suspiciousness or hostility

3. Oddities of though, perception, speech and behavior

4. Persistent disturbances of mood or affect

5. Pathological dependence, passibity, or aggressivity

6. Intense and unstable interpersonal relationships and impulsive and damaging behavior"

To meet Listing 12.04, the condition must a claimant must also show (under the "'B' Criteria") that the condition results in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

*or* (under the "'C' Criteria):

"repeated episodes of compensation," [or]a disease process in which "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," or "a current history of 1 or more years' inability to function outside a highly supportive living arrangement . . ."

While Listing 12.04 is met by a combination of the A and B Criteria, or A and C Criteria, Listing 12.08 must meet the A and B Criteria. *Nelson v. Commissioner of Social Security,* 2006 WL 2472910, *7 (6th Cir. 2006). Thus, Dr. Zubairi's June, 2009 finding that Plaintiff experienced affective and personality disorders, accompanied marked social and concentrational limitations and repeated episodes of decompensation (if fully credited by the ALJ) would mandate a disability finding at Step Three (438, 447).

Substantial evidence, as discussed in Section **B**, supporting the ALJ's rejection of Dr. Zubairi's findings need not be repeated here. Plaintiff's daily activities and her own admission that psychological problems did not prevent her from a wide range of activities undermine Dr. Zubairi's extreme assessment. Assuming for the sake of argument that the events leading up to the February, 2007 4-day inpatient treatment could be characterized as an episode of "decompensation," the ALJ pointed out that the allegedly disability level limitations, starting in June, 2006, would not have met the 12-month durational period required to support the claim. April, 2007 treating notes, stating that Plaintiff had a "good" prognosis, document consciously selfish and manipulative behavior impacting Plaintiff's family (Tr. 254, 257, 275). These actions, while feckless and indicative of some level of psychological impairment, do not suggest a psychological condition precluding all work (Tr. 254, 257, 275).

May and July, 2008 therapy notes show that Plaintiff declined to enter intensive therapy, but enrolled in college courses (Tr. 328, 338). In May, 2009, Plaintiff stated that she had not taken psychotropic medication or cut herself "for quite some time" (Tr. 495). The fact that she terminated her relationship with Rowland on June 5, 2009 (dovetailing neatly with the administrative hearing on June 16) lends further credence to the ALJ's conclusion she did not experience meaningful psychological limitations "for more than a few days at a time a couple of times a year since the alleged onset date" (Tr. 18).

To be sure, the record supports some level of dysfunction. The recommendation to uphold the ALJ's opinion should not be read to trivialize the impact of Plaintiff's behavior (stemming from

either her unconcern for others, psychological impairment, or a combination of the two) on her husband, child, and other family members. Nonetheless, the ALJ's determination that she was not disabled from all work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment DENIED.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: December 3, 2010

-19-

## CERTIFICATE OF SERVICE

I hereby certify on December 3, 2010 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on December 3, 2010: **None.**

s/Michael E. Lang
Deputy Clerk to
Magistrate Judge R. Steven Whalen
(313) 234-5217